[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13776
Non-Argument Calendar

_____

Agency No. A209-154-612

SUKHDEV SINGH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 20, 2021)

Before NEWSOM, ANDERSON, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Petitioner Sukhdev Singh, a native and citizen of India, seeks review of the Board of Immigration Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") denial of asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Petitioner claimed that he was a member of the Shiromoni Akali Dal Amritsar Simranjit Singh Mann Party ("Mann Party"), a political party that he described as opposing the use of drugs and alcohol and advocating for a state of its own, known as "Khalistan." Petitioner further claimed that, as a member of the Mann Party, he would be persecuted by members of two ruling political parties in India, namely, the Akali Dal Badal Party ("Badal Party") and the Bharatiya Janata Party ("BJP Party"). The IJ, however, denied Petitioner's application for relief, finding that he had neither testified credibly nor adequately corroborated his claims. On appeal to the BIA, Petitioner argued both that the IJ had clearly erred in its findings and that the IJ had deprived him of his due process rights by failing to act impartially. The BIA rejected Petitioner's due process challenge and affirmed the IJ's credibility and corroboration findings.

On appeal, Petitioner argues that he did not receive a fair hearing before the IJ, that substantial evidence did not support the agency's adverse credibility and corroboration findings, and that the BIA applied the wrong standard in denying his

CAT claim.  After careful review, we are unpersuaded by Petitioner's arguments.

Accordingly, we deny his petition for review.

## I.    BACKGROUND

Petitioner entered the United States near Calexico, California in July 2016.

Because Petitioner expressed fear of returning to India, an asylum officer placed

him under oath and conducted a credible-fear interview through a Punjabi

interpreter.  During the interview, Petitioner stated that that he had traveled

through Ethiopia, Brazil, Panama, Ecuador, Colombia, Costa Rica, Nicaragua, El

Salvador, Guatemala, and Mexico on his way to the United States.  Petitioner

described himself as a member of the Mann Party[1] who had participated in party

programs and helped arrange events.  According to Petitioner, in an attempt to

force him to leave his political party, members of the BJP and Badal Parties had

attacked and beaten him three times between January 13, 2016 and March 29,

2016.  He described an attack on January 13, 2016, when eight men beat him with

a baseball bat before fleeing in a vehicle marked with a Badal Party insignia.

Petitioner said he had been attacked as second time on March 25, 2016, when he

went to donate blood.  Describing a third attack on March 29, 2016, Petitioner said

that four men had beaten him as he was heading home after attending a program in

---

[1]  Although Petitioner initially had difficulty identifying the official name of his political party, he ultimately referred to it as the "Manndall" Party during the credible-fear interview.  Later in the proceeding, he referred to the political group simply as the "Mann" party.

3

a temple in a nearby city. Petitioner expressed fear that he would be killed if he returned to India. Finding that Petitioner had established a credible fear of persecution, the asylum officer referred the matter to the immigration court.

The Department of Homeland Security then issued Petitioner a notice to appear, charging him with being removal as an alien present in the United States without a valid immigration document. Through counsel, Petitioner conceded removability. He then filed an application for asylum, withholding of removal, and CAT relief, claiming that members of the BJP and Badal Parties had beaten him three times, on January 13, 2016, March 25, 2016, and March 29, 2016, based on his political affiliation with the Mann Party. On his application, he stated that he had not applied for asylum while traveling through Ecuador, Columbia, Panama, Costa Rica, Nicaragua, El Salvador, Guatemala, and Mexico on his way to the United States.

The IJ released Petitioner from custody on a $50,000 bond. On January 25, 2017, the IJ ordered Petitioner removed *in absentia* for failure to appear at an 8:00 a.m. hearing. When Petitioner arrived in the courtroom at 9:05 a.m., claiming that he had been in the waiting room since 7:00 a.m., the IJ explained that he had already ordered Petitioner removed *in absentia* and that, although both the IJ and the interpreter had arrived early, neither had seen Petitioner waiting. Because Petitioner had been ordered removed, the IJ revoked Petitioner's bond and

explained that he no longer had jurisdiction for a bond. The IJ further explained that Petitioner could file a motion to reopen the case but that, if he was successful in doing so, there was no guarantee that he would be released on bond a second time, particularly because he had taken a route through many countries to arrive at the United States.

Petitioner filed a motion to reopen, which the IJ denied. The BIA, however, concluded that Petitioner's late arrival for his hearing did not constitute a failure to appear. Accordingly, the BIA rescinded the *in absentia* order and remanded the case to the IJ.

Petitioner then filed an amended asylum application and supporting documents, including a signed declaration from Petitioner, affidavits from Petitioner's father, wife, and fellow village member, several medical certificates, and country conditions evidence. In his amended application, Petitioner claimed that he had been attacked and beaten on four occasions, starting with an attack on June 3, 2014. In his declaration, Petitioner described being attacked by BJP and Badal Party members four times, on June 3, 2014, January 13, 2016, March 25, 2016, and March 26, 2016. As relevant here, Petitioner said that, on March 25, 2016, BJP and Badal Party members had hit him with a car while he was riding his bike to the hospital to donate blood, and that three men then exited the vehicle and beat him with sticks and stones.

Petitioner also submitted three short affidavits from his father, his wife, and a fellow village member. Petitioner's father stated that BJP and Badal Party members had tortured Petitioner four times due to his affiliation with the Mann Party. Petitioner's wife said that Petitioner worked for the Mann Party and had been attacked by members of the BJP and Badal Parties "many times," with the last attack occurring in 2016. Finally, a member of Petitioner's village stated that he had learned at a meeting that Petitioner had been attacked a first time on January 13, 2016 and a second time on March 25, 2016.

Medical certificates dated in 2017 purported to describe treatment Petitioner had received for injuries sustained in 2014 and 2016. The first certificate stated that, in June 2014, Petitioner had been treated with intravenous ("IV") injections, oral medications, and a "plaster cast" for "multiple blunt injuries," including a "fractured" hand that was "swollen massively." A second certificate stated that Petitioner had received IV injections, oral medications, and crepe bandages in January 2016 to address "blunt injuries" to his head, shoulder, and waist. A final medical certificate regarding treatment on March 29, 2016 stated that Petitioner had received IV injections, oral medications, and crepe bandages to treat "blunt" injuries to his shoulders and right foot.

The IJ held a merits hearing in February 2018, where Petitioner testified under oath. In relevant part, Petitioner testified that he was beaten while protesting

6

outside a police station on June 3, 2014, resulting in injuries to his neck and hand. According to Petitioner, doctors treated a cut to his hand by implanting a rod and giving him stitches. Petitioner said he was attacked again on January 13, 2016, when six to eight BJP and Badal Party members beat him with baseball bats or hockey sticks until he was unconscious. Petitioner said that he tended to forget things as a result of the head injury. When asked whether he had filed police reports regarding the beatings, Petitioner testified that he was afraid to file police reports because the police, who were members of the BJP and Badal Parties, had previously beaten him and thrown him out of a police station.

Petitioner said that a third attack occurred on March 25, 2016, when he was on his way to a blood bank to donate blood. According to Petitioner, he refused to leave the Mann Party and the BJP and Badal Party members responded by beating him at the waist and shoulder with a hockey stick, resulting in injuries and four days of hospital care. Petitioner said that the final attack occurred when his cousin was helping him get home after being discharged from the hospital on March 29, 2016. The attack, Petitioner testified, resulted in him having a badly cut foot and an exposed nerve that required stitches at the hospital.

During the hearing, the IJ attempted to resolve several apparent inconsistencies in Petitioner's testimony. For example, the IJ asked why Petitioner had told the asylum officer during the credible-fear interview that the March 29

7

attack occurred on his way home from a temple rather than on his way home from the hospital, and Petitioner responded that it was his cousin, rather than Petitioner, who had been returning from the temple. The IJ also probed an apparent inconsistency in Petitioner's description of how he had reached the United States, after Petitioner testified that he traveled through Ecuador, Columbia, Panama, Costa Rica, Nicaragua, El Salvador, Guatemala, and Mexico, leaving out other countries he had previously mentioned. When asked for clarification about his route to the United States, Petitioner added that he had gone to Ethiopia and Brazil before going to Ecuador. Petitioner also alleged that he was unable to understand some of the questions during the credible-fear interview because the interpreter used a Pakistani dialect of Punjabi that differed from Indian Punjabi.

The IJ invited Petitioner's counsel to submit a written closing argument to direct the court's attention to specific evidence in the record. After Petitioner submitted a brief supporting his requests for relief, the IJ denied Petitioner's application for asylum, withholding of removal, and CAT relief. Finding that Petitioner had made numerous inconsistent statements throughout the proceedings, the IJ concluded that he was not credible. Further, the IJ found that Petitioner had failed to reasonably corroborate his claim "in a number of respects." Because Petitioner had neither testified credibly nor reasonably corroborated his claims, the IJ denied his application for asylum, withholding of removal, and CAT relief.

On appeal to the BIA, Petitioner challenged the IJ's factual findings and argued that the IJ had failed to act impartially, in violation of his due process rights. The BIA, however, rejected Petitioner's due process argument and affirmed the IJ's denial of relief. Focusing on four inconsistencies that went to the heart of Petitioner's claim, the BIA concluded that the IJ had not clearly erred in finding that Petitioner was not credible. The BIA further concluded that Petitioner's medical evidence contradicted key aspects of his testimony, and that the affidavits he had submitted failed to adequately corroborate important aspects of his claim. Accordingly, the BIA concluded that Petitioner was not entitled to asylum or withholding of removal. Finally, the BIA concluded that the IJ did not err in denying Petitioner's CAT claim because he had neither testified credibly nor corroborated his claims, and Petitioner's country-condition evidence failed to establish that he was personally at risk of torture. This appeal followed.

## II.    DISCUSSION

On appeal, Petitioner argues that:  (1) the BIA failed to give reasoned consideration to, and erred in rejecting, his claim that bias on the part of the IJ deprived him of due process; (2) the BIA erred in denying his asylum and withholding-of-removal claims because substantial evidence did not support its conclusions that he neither testified credibly nor provided adequate corroborative evidence; and (3) substantial evidence did not support the BIA's denial of CAT

9

relief because it applied an incorrect legal standard. We address each argument in turn.

### A.    Standard of Review

We review only the BIA's decision as the final agency decision, unless it expressly adopted the IJ's opinion or agreed with the IJ's reasoning. *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). Here, because the BIA issued its own decision, we review the IJ's decision only to the extent that the BIA agreed with it. *Id.*

We review constitutional claims *de novo*. *Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1252 (11th Cir. 2008). Likewise, we review *de novo* whether the agency failed to give reasoned consideration to an applicant's claim. *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 872 (11th Cir. 2018).

In petitions for review of BIA decisions, we review legal conclusions *de novo* and factual determinations under the substantial evidence test. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016). Under the substantial evidence test, we must "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1286 (11th Cir. 2020) (quotation marks omitted). "[W]e must affirm the BIA's factual findings so long as they are supported by reasonable, substantial, and probative evidence on the record

10

considered as a whole." *Id.* (quotation marks omitted). To reverse a finding of fact, we "must find that the record not only supports reversal, but compels it." *Perez-Zenteno*, 913 F.3d at 1306 (quotation marks omitted).

### B.    Asylum and Withholding of Removal

An alien may receive asylum in the United States if he qualifies as a "refugee" within the meaning of the Immigration and Nationality Act ("INA"). INA § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A). The INA defines a "refugee" as one who cannot return to his home country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). The applicant bears the burden of proving that he is a refugee. INA § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i). An applicant may carry that burden by proving that he suffered past persecution on account of a protected ground, which creates a rebuttable presumption of a well-founded fear of future persecution. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1351 (11th Cir. 2009). Alternatively, an applicant can prove that he has a well-founded fear of future persecution by establishing a "reasonable possibility" that he will suffer persecution based on a protected ground upon return to his home country. *Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) (emphasis omitted).

11

Similarly, to qualify for withholding of removal under the INA, an alien must show that, if returned to his country, his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.  INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A).  To carry his burden, the alien must demonstrate that he would "more likely than not" be persecuted if returned to the country of removal.  *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 819 (11th Cir. 2004) (quotation marks omitted).  If an alien is unable to establish that he qualifies for asylum, he cannot meet the "more stringent" standard for withholding of removal.  *Id.*

## 1.     Reasoned Consideration and Due Process

On appeal, Petitioner argues that he did not receive a fair hearing, as required by due process, because the IJ was not a neutral arbiter.[2]  He also argues that the BIA failed to give reasoned consideration to his due process claim because it failed to specifically mention his argument that the IJ was biased against him for having taken a "circuitous route" to the United States.  These arguments are meritless.

---

[2]  Because "the failure to receive relief that is purely discretionary in nature does not amount to a deprivation of a liberty interest," *Alhuay v. U.S. Att'y Gen.*, 661 F.3d 534, 548 (11th Cir. 2011), Petitioner only argues that he was denied due process as to the non-discretionary forms of relief he sought, namely, withholding of removal and protection under the CAT.

"To establish due process violations in removal proceedings, aliens must show that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." *Sama v. U.S. Att'y Gen.*, 887 F.3d 1225, 1234 (11th Cir. 2018) (quotation marks omitted). "Due process is satisfied only by a full and fair hearing." *Alhuay v. U.S. Att'y Gen.*, 661 F.3d 534, 548 (11th Cir. 2011) (quotation marks omitted). "To show substantial prejudice, an alien must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different." *Id.* (quotation marks omitted).

As an initial matter, the record belies Petitioner's argument that the BIA failed to give reasoned consideration to his due process claim. The BIA must give reasoned consideration to an applicant's claims and make adequate factual findings to enable our review. *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006). "Although the BIA need not write an exegesis on every contention, it must nonetheless consider the issues raised by the applicant and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Min Yong Huang v. Holder*, 774 F.3d 1342, 1349 (11th Cir. 2014) (cleaned up).

Here, the BIA expressly rejected Petitioner's argument that alleged bias on the part of the IJ resulted in a due process violation. The BIA stated that, after

13

reviewing the record, it was "not persuaded" that the IJ was "predisposed to deny [Petitioner's] claim" and was instead persuaded that the IJ had "ensured that [Petitioner] had a full and *fair* opportunity to present his case." (emphasis added). Moreover, the BIA supported its conclusion with citations to the merits-hearing transcript that reveal the BIA's careful review of Petitioner's case for bias. Specifically, the BIA cited portions of the transcript where the IJ had (1) counseled Petitioner not to speak over the interpreter so the IJ "c[ould]be assured that [the interpreter] doesn't miss a word of [Petitioner's testimony]," (2) invited Petitioner's counsel to file a written closing statement to "focus" the IJ's attention on "the [relevant] evidence presented," and (3) told Petitioner's counsel that he did not need to "limit [him]self" to "[j]ust a few more questions" and should instead take his time to elicit all the relevant testimony. The BIA was not required to do more to demonstrate that it gave reasoned consideration to Petitioner's claim. *See Point du Jour v. U.S. Att'y Gen.*, 960 F.3d 1348, 1351 (11th Cir. 2020) ("The BIA is not required to specifically discuss each and every piece of evidence presented by the petitioner."), *cert. denied sub nom. Sylvestre Esteeven Point du Jour v. Garland*, 141 S. Ct. 1692 (2021).

On the merits, we agree with the BIA that Petitioner failed to establish a due process violation. Petitioner's primary argument is that the IJ demonstrated his bias by (1) stating at the hearing immediately after the IJ had ordered Petitioner

14

removed *in absentia* that Petitioner's "circuitous route" to the United States was "not excusable," and (2) denying his claims "based in huge part on the 'circuitous route' theory." These arguments misconstrue the record. When considered in context, Petitioner has not shown that the IJ was predisposed to deny his claims based on the route that he took to the United States.

First, the IJ stated that "the routes taken to the United States . . . are not excusable" in the context of explaining why Petitioner was a flight risk and might not be release on bond if he succeeded in overturning the IJ's *in absentia* removal order. If this were not clear enough from the hearing transcript, the IJ's order denying bond after the BIA's reversed his *in absentia* removal order clarifies why the IJ found Petitioner's circuitous route to the United States relevant. Specifically, the IJ found that Petitioner was a flight risk because he had moved out of the jurisdiction without notifying the IJ and failed to timely show up in the courtroom for his merits hearing after being granted bond the first time, and he had also "taken a circuitous route to come to the United States." Petitioner has not shown why Petitioner's history of traversing multiple borders without permission was not a valid consideration in determining whether he was likely to show up for a future hearing.

Second, Petitioner has not shown that the IJ denied his asylum application based on an impermissible bias against applicants who took "circuitous routes" to

the United States. In his written decision, the IJ found that Petitioner gave inconsistent testimony about which countries he had passed through before entering the United States, and that his failure to seek asylum in any of the up-to-ten countries he might have traversed suggested that he did not subjectively fear persecution in India. Thus, the IJ considered Petitioner's "circuitous route" only insofar as it showed Petitioner had not testified credibly. Petitioner has not shown why these findings evidenced a bias rather than reasoned analysis of his credibility based on evidence in the record. *See Alhuay*, 661 F.3d at 549 (concluding that "the hearing transcripts reveal[ed] no bias on the part of the IJ" but rather "simply reflect[ed] his rejection of [the petitioner's] incredible explanations for the discrepancies in her records and testimony").

In addition, Petitioner has not shown prejudice from the IJ's reliance on his "circuitous route" to the United States. The IJ's findings on that issue played only a minor role in the IJ's adverse credibility finding, as they came in the middle of a lengthy discussion of numerous inconsistencies in Petitioner's testimony. Moreover, those findings played no role in the BIA's ultimate decision because the BIA did not rely on them.[3]

---

[3] Petitioner's other arguments regarding bias are likewise meritless. Petitioner notes that the IJ (1) imposed an excessive bond of $50,000, (2) erroneously ordered him removed *in absentia*, (3) had denied similar asylum claims, (4) denied about 95% of asylum claims, and (5) was elevated to the BIA while Petitioner's appeal was pending before the BIA. None of these facts, however, show that the IJ denied the specific claims that Petitioner raised on an improper basis.

16

In short, we agree with the BIA that Petitioner was afforded a full and fair hearing before the IJ. He has shown neither that impermissible bias influenced the IJ's decision-making nor substantial prejudice from any bias the IJ might have had. Accordingly, we reject Petitioner's due process argument. *See id.* (rejecting an argument that the IJ's purported bias had denied the petitioner a full and fair hearing because the IJ had given the petitioner "ample opportunity to testify and to present evidence on her behalf").

### 2.    Credibility

Next, Petitioner argues that substantial evidence did not support the BIA's decision affirming the IJ's adverse credibility finding. Our review of the record, however, reveals more than substantial evidence supporting the agency's determination that Petitioner was not credible.

"As with other factual findings, credibility determinations likewise are reviewed under the substantial evidence test." *Xiu Ying Wu v. U.S. Att'y Gen.*, 712 F.3d 486, 493 (11th Cir. 2013) (alteration accepted) (quotation marks omitted). "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the BIA with respect to credibility findings." *Id.* (quotation marks omitted). Although a credibility determination may not be based on "speculation and conjecture," the agency has broad discretion to assess an applicant's credibility and need only provide "specific, cogent reasons" supporting

17

an adverse credibility determination. *Id.* (quotation marks omitted). "Once an adverse-credibility determination is made, the burden then shifts to the alien to show that the [agency's] credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." *Id.* (alteration accepted) (quotation marks omitted).

As an initial matter, the record belies Petitioner's accusation that the BIA "[r]ealiz[ed] that many of [the IJ's] reasons for the adverse credibility finding were not valid" and therefore "cherry picked" a subset of the inconsistencies that the IJ had highlighted. While it is true that the BIA focused on four primary inconsistencies in Petitioner's testimony, rather than reviewing the litany of inconsistencies identified in the IJ's decision, the BIA provided a reasonable explanation for doing so. Specifically, the BIA stated that it had focused on four inconsistencies that were particularly relevant because they "bear directly on essential aspects of [Petitioner's] asylum claim." Given that the BIA could have affirmed the IJ's adverse credibility determination based on even fewer inconsistencies or omissions, *see Xia v. U.S. Att'y Gen.*, 608 F.3d 1233, 1240 (11th Cir. 2010), even inconsistencies or omissions that did not go to the heart of the claim, *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1233 (11th Cir. 2006), we can hardly fault the BIA for identifying *four* inconsistencies *bearing directly* on the credibility of Petitioner's claim.

18

Here, the BIA provided specific and cogent reasons, supported by substantial evidence, for affirming the IJ's adverse credibility finding. First, the BIA concluded that Petitioner's statements at the merits hearing and on his amended asylum application that he was attacked *four times with the first attack occurring on June 3, 2014* contradicted his asylum application and credible-fear interview, where he had said he was attacked *three times with the first attack occurring on January 13, 2016.*

The record shows that Petitioner's testimony about these matters was indeed contradictory. In his amended application, Petitioner claimed that he had been attacked and beaten on four occasions, starting with an attack on June 3, 2014. Similarly, at the merits hearing, Petitioner identified four dates on which he had been attacked and said he was first beaten on June 3, 2014, when members of his party were protesting outside a police station. By contrast, in his original asylum application, Petitioner stated that he was attacked three times, starting with an attack on January 13, 2016. Similarly, during his credible-fear interview, Petitioner said that Badal Party members had physically harmed him two or three times, with the first attack occurring on January 13, 2016.

Petitioner's assertion on appeal that "providing more detail" during his amended application and merits hearing did not constitute "an inconsistency" is unpersuasive. Petitioner's story clearly changed over time, with his later testimony

pushing the start of the alleged persecution back a year and a half.  *See Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1043–46, 1049–50 (11th Cir. 2009) (affirming an adverse credibility finding where the asylum applicant described only one incident of harm during his credible-fear interview but described three such incidents during asylum proceedings).

Second, the BIA concluded that Petitioner had testified inconsistently with respect to the alleged attack on March 25, 2016, stating at the merits hearing that *four* BJP and Badal Party members *had stopped him* and beat him with a hockey stick while he was on his way to donate blood, but stating in an earlier declaration that *three* people had *hit him with a car* and beat him while he was going to donate blood.  Here, the record reveals a clear inconsistency by omission.  At the merits hearing, Petitioner testified that "[f]our persons stopped [him]" and beat him with a hockey stick on March 25, 2016.  In an earlier-filed declaration, however, Petitioner had stated that, on March 25, 2016, "[a] car hit [him]" while he was riding his bike to the hospital to donate blood, and then "[a]bout 3 people came out of the car and attacked me . . . . with sticks and stones."  Even assuming that Petitioner's testimony about the number of assailants was consistent, Petitioner's failure to testify at the merits hearing about highly salient details of the attack— being hit by a car while riding a bike and being beaten with stones—calls into question the credibility of his testimony.  *See Forgue v. U.S. Att'y Gen.*, 401 F.3d

20

1282, 1285, 1287 (11th Cir. 2005) (affirming an adverse credibility determination where the alien failed to mention significant details and events supporting his asylum claim in his application or at an interview with an asylum officer). While Petitioner now argues that this testimony was not inconsistent because he maintained that the attack occurred while he was going to donate blood, his attempt to shift focus away from the inconsistent details is unpersuasive.

Third, the BIA found that Petitioner had testified inconsistently with respect to the alleged March 29, 2016 attack because he had said at the merits hearing that he was attacked *when he left the hospital*, but he had stated during his credible-fear interview that the attack occurred *when he was leaving a program held in a temple*. Here, the BIA accurately portrayed the record. During the credible-fear interview, Petitioner said that on March 29, 2016 "we were coming from the nearby city attending a program" at a temple and four men beat him "when we came out." But when it came time to testify at the merits hearing, Petitioner told a different story, stating that he was discharged from the hospital on March 29, 2016, and that he was attacked while his cousin was bringing him home. When asked to explain this discrepancy, Petitioner said that it was his cousin, rather than him, who was returning from the temple. But this did not resolve the contradiction. Contrary to Petitioner's assertions on appeal, Petitioner clearly stated during the credible-fear interview that Petitioner had also been returning from the temple. *See Chen*, 463

21

F.3d at 1233 (noting that even a tenable explanation for inconsistencies does not compel reversal of an adverse credibility determination).

Fourth, the BIA found that Petitioner had testified inconsistently by omitting important information about alleged police beatings. The BIA found that, although Petitioner had testified at the merits hearing that the police beat him when he reported false charges filed against him, he had not previously mentioned a police beating in any of his prior statements. Once again, substantial evidence supported the BIA's findings. At the merits hearing, Petitioner testified for the first time that the police had beaten him after he had tried to report BJP and Badal Party members for filing false criminal charges against him. This was a salient omission from his prior testimony because Petitioner also testified that the police were BJP and Badal Party members—that is, members of the groups he alleged were responsible for persecuting him.

Petitioner argues on appeal that his testimony was the product of "aggressive interrogation by the IJ," but this suggests only that his testimony regarding the police beating might have been fabricated and therefore non-credible. Setting that issue aside, however, it is safe to say that Petitioner's argument does not address why he failed to mention important details regarding his persecution claim earlier, despite opportunities to do so in his credible-fear interview, original asylum application, and signed declaration. *See Forgue*, 401 F.3d at 1285, 1287.

Petitioner raises two additional arguments as to why the BIA should not have relied on his credible-fear interview as a basis for finding him non-credible, but neither is persuasive.[4]  First, Petitioner argues that credible-fear interviews may not be used to undermine an applicant's credibility because such proceedings are informal and lack indicia of reliability.  The BIA rejected his argument, however, noting that there were no persuasive reasons to doubt Petitioner's understanding of the interview questions.  As the BIA correctly noted, the interview was conducted in his native language and the asylum officer asked specific and detailed questions regarding his prior experiences and fear of future harm.  Moreover, the INA expressly provides that a credibility determination may be made based on the "consistency between the applicant's . . . *oral statements* (*whenever made and whether or not under oath . . .* )."  INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).  Thus, credible-fear interviews are fair game when considering whether an applicant has testified credibly.

Second, Petitioner argues that inconsistencies between his testimony at the merits hearing and during the credible-fear interview are readily explainable by the fact that (1) he had difficulty understanding the Pakistani Punjabi interpreter's dialect, as evidenced by the fact that his responses to certain questions "ma[de] no

---

[4]  Notably, even if we were persuaded by these arguments, they would not undermine the BIA's adverse credibility finding because the BIA identified four inconsistencies, and only two of those inconsistencies were based on Petitioner's testimony during the credible-fear interview.

sense," and (2) he has memory problems, as evidenced by the fact that, during the credible-fear interview, he remembered signing forms provided by an immigration officer but did not remember the documents' contents.

The BIA, however, rejected these explanations for Petitioner's inconsistencies, and substantial evidence supported its findings. Specifically, the BIA found that, during the credible-fear interview, Petitioner confirmed that he understood the interpreter's questions and that he did not have trouble remembering past events. The record bears this out. During the credible-fear interview, the asylum officer specifically asked Petitioner if he had "any medical or health conditions" and if he had "any trouble . . . remember[ing] things [that] happened in the past." In response to both questions, Petitioner definitively answered, "No." Further, at the conclusion of the interview, Petitioner answered "Yes" when asked if he had "underst[ood] all the questions asked today." And when the asylum officer asked Petitioner if he had "any problems understanding the interpreter" and asked the interpreter if he had "any problems understanding [Petitioner]," both individuals responded, "No." Given these answers, we cannot say that the record compels a different finding.

Because the BIA gave several specific and cogent reasons for affirming the IJ's adverse credibility determination, and substantial evidence supported the

BIA's findings, we affirm the agency's determination that Petitioner was not credible.

### 3.     Corroboration

On appeal, Petitioner also challenges the BIA's determination that the IJ did not clearly err in finding that Petitioner failed to corroborate his claims. Under the REAL ID Act of 2005, an IJ may require that an applicant provide reasonably available corroborating evidence to support his claim. *See* INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."). Due to Petitioner's credibility issues, the IJ found that reliable corroboration of his claims was of increased importance. The IJ found, however, that Petitioner had failed to reasonably corroborate his claim in a number of respects, and the BIA affirmed.

Here, substantial evidence supported the BIA's corroboration findings.[5] First, the BIA found that the medical evidence did not corroborate—and instead undermined—Petitioner's testimony about the injuries he sustained and the treatment he received following the June 3, 2014 and March 29, 2016 attacks.

---

[5] The BIA adopted only a subset of the IJ's corroboration findings. Because we lack jurisdiction to review corroboration findings that the BIA did not adopt, *Perez-Zenteno*, 913 F.3d at 1306, we do not address Petitioner's arguments targeting additional corroboration findings made by the IJ.

Specifically, the BIA concluded that the medical records showing that Petitioner received *a plaster cast* to treat a *swollen and fractured hand* did not corroborate his testimony that he received *a rod and stitches* to treat a severely *cut hand* after the alleged June 3, 2014 attack.  The BIA further found that the medical records showing that he was treated with an IV injection, pain medication, and a bandage for *blunt* injuries to his shoulder and foot did not corroborate his testimony that he had sustained a *cut* on his foot that *exposed a nerve* during the alleged March 29, 2016 attack.

The record fully supported these findings.  At the merits hearing, Petitioner testified that his hand was cut during the June 3, 2014 beating, requiring doctors to put a rod in his hand and give him stitches.  He further testified that the March 29, 2016 attack resulted in a badly cut foot and an exposed nerve that required stitches.  Rather than corroborating these facts, however, the medical certificates Petitioner submitted contradicted his testimony.  Specifically, the June 2014 medical record did not indicate that he required stitches for a cut hand but rather that his hand was "fractured" and "swollen" from "blunt injuries" and required a "plaster cast."  Similarly, the medical certificate regarding his March 25, 2016 injuries does not indicate that he had a cut foot, an exposed nerve, or stitches but rather that he had a "blunt injury" to his foot that required bandages.  Although Petitioner asserts that it is "really difficult" to understand why the BIA believed the medical records failed

to corroborate his testimony, we disagree. A cut, especially one requiring invasive surgery, is not the same thing as blunt injury. Thus, substantial evidence supported the BIA's conclusion that the medical evidence did not corroborate Petitioner's testimony.

The BIA also found that the affidavits Petitioner submitted inadequately corroborated Petitioner's claim. Specifically, the BIA concluded that the affidavits from his father and wife "only generally corroborate[d] the claim" because they confirmed neither details of the attacks nor Petitioner's injuries, and the affidavit from a village member[6] failed to corroborate Petitioner's testimony regarding the total number of attacks or the date of the first attack.

Here too, the record supported the BIA's findings. The affidavits from Petitioner's father and wife were devoid of specifics. In conclusory fashion, Petitioner's father stated that BJP and Badal Party members had "tortured [Petitioner] four times" and had "tr[ied] to kill my son several times" due to his affiliation with the Mann Party. Similarly, Petitioner's wife stated that Petitioner was "a good worker" for the Mann party and that he had been "attacked may times and almost got killed by BJP and [the Badal] Party Government," with "the last attack occurring in 2016." Neither affidavit, however, showed that Petitioner's

---

[6] The BIA referred to the village member as a Mann Party member. The identity of the man, however, is irrelevant here.

father or wife had personal knowledge of any attacks or even second-hand knowledge about specifically when Petitioner was injured or the nature of those injuries.

Likewise, the affidavit from a village member indicated that the man had no personal knowledge of Petitioner's claims or any knowledge whatsoever regarding two of the alleged attacks. Specifically, the village member stated that he "was informed in [a] meeting that [Petitioner] was attacked" by BJP and Badal Party members, meaning that he did not have personal knowledge of the matter. Further, the village member stated that Petitioner was attacked for the "[f]irst time [o]n 13th January 2016 and [for the] second time [o]n 25th March 2016," indicating that he did not know about the alleged attacks on June 3, 2014 and March 29, 2016.

Given that Petitioner failed to testify credibly or provide evidence corroborating many important aspects of his claim that BJP and Badal Party members had persecuted him for his political opinions—including details about when he was attacked and the nature of his injuries—substantial evidence supported the BIA's denial of his application for asylum. *See Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 967 (11th Cir. 2012) ("An adverse credibility determination coupled with a lack of corroborating evidence for a claim of persecution means that the applicant's claim fails."). Further, because Petitioner was unable to establish that he qualified for asylum, he could not meet the more

28

stringent standard for withholding of removal. *See D-Muhumed*, 388 F.3d at 819. Accordingly, we affirm the BIA's denial of asylum and withholding of removal.

## C.    Convention Against Torture

The BIA also denied Petitioner's application for CAT relief, finding that his CAT claim was based on the same facts as the asylum and withholding-of-removal claims, which were found to be lacking in credibility and corroboration, and that the country conditions evidence did not sufficiently establish that "he is personally at risk of torture." Although Petitioner challenges the BIA's ruling on appeal, we conclude that substantial evidence supported its determination.

An applicant for CAT relief must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal" and that the government would consent or acquiesce to the torture. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004) (quotation marks omitted). In assessing whether an applicant has satisfied his burden of proof, the agency must consider all evidence relevant to the possibility of future torture, including "[e]vidence of past torture inflicted upon the applicant" and "relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3).

Here, as an initial matter, Petitioner's argument that the BIA applied an incorrect standard when it required him to establish that he was personally at risk of torture is mistaken. For an applicant to show a likelihood of future torture, the

applicant must "establish that it is more likely than not that *he or she* would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.16(c)(2) (emphasis added).  That means the applicant must establish that he or she "would be *individually* and *intentionally* singled out for harsh treatment."  *Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007) (emphasis in original). "[E]vidence of generalized mistreatment and some isolated instances of torture" is insufficient to show that an applicant is "individually 'more likely than not to be tortured in the country of removal.'"  *Id.* (quoting 8 C.F.R. § 208.16(c)). Accordingly, the BIA applied the correct legal standard.

Substantial evidence supported the BIA's denial of Petitioner's CAT claim because Petitioner's country-conditions evidence did not suggest that he was likely to be tortured.  For starters, much of the evidence on which Petitioner relied had no bearing on his claim because it evidenced only "generalized mistreatment" in India without any direct relevance to his claim.  *Id.*  For example, on appeal, Petitioner quotes passages from the State Department's Country Report on India stating that there are instances of police abuses and reports of unlawful killings by government agents.  Such statements, however, have no bearing on whether BJP or Badal Party members are likely to torture a Mann Party member, much less whether they would be likely to torture Petitioner in particular.

The most relevant evidence Petitioner has identified comes from a 2012 Law Library of Congress report titled "India: Persecution of the Shiromani Akali (Mann) Party." Petitioner points to passages in the report stating that "[t]here is evidence of ill-treatment and harassment from the Punjab police towards leaders and members of the Mann Party," that a coalition group including some Mann Party members had "accused" the Badal party of "threatening them" and "filing 'false' criminal charges against them" during an election in 2011, and that members of a Mann Party faction had filed a lawsuit in the United States "for alleged abuses and torture by police and other security forces under the direction of . . . a leader of the Badal party." Setting aside the fact that Petitioner ignores contrary evidence in the report—namely, expert opinion that Mann Party members "are not generally harassed or ill-treated by the Police"—the statements Petitioner highlights are insufficient to show that he would be targeted for torture because they at best show "some isolated instances" of mistreatment in India. *Id.* Indeed, the report repeatedly notes that it is reporting on "instances" and "incidents" of abuse. Such statements fall short of what is required to show that "it is more likely than not that [the applicant] would be tortured if removed." 8 C.F.R. § 208.16(c)(2). Accordingly, we affirm the BIA's denial of CAT relief.

31

## III.    CONCLUSION

Because substantial evidence supported the agency's denial of Petitioner's application for asylum, withholding of removal, and CAT relief, we deny the petition.

**PETITION DENIED.**